SAM HERRICK, Appellant, v. J. A. WOODSON, Respondent.

**Springfield Court of Appeals, April 4, 1910.**

1. REAL ESTATE BROKER: Producing Purchaser: Commission. A real estate agent is entitled to his commission when he produces a purchaser ready, able and willing to buy on the terms authorized by the principal. Evidence in the case examined and held sufficient to make a prima-facie case and entitled plaintiff to go to the jury.

2. ———: ———: ———: Owner Refusing to Sell: Wife Refusing to Sign Deed. Where the owner refuses to sell after the broker has produced a buyer who is able, ready and willing to buy upon the terms proposed, the law regards the sale as made in so far as to entitle the agent to his commission, and the unwillingness of the owner's wife to make the sale or sign the deed is no defense.

Appeal from Greene Circuit Court.—*Hon. James T. Neville,* Judge.

REVERSED AND REMANDED.

*Patterson & Patterson* for appellant.

(1) A real estate agent is entitled to his commission when he procures a purchaser able and willing to buy on the terms authorized by the principal, and the purchaser is ready, able and willing to carry out such terms. Morgan v. Keller, 194 Mo. 663. (2) The refusal of the owner's wife to join in the deed will not relieve the owner from liability for the commission.

McCray v. Pfast, 118 Mo. App. 672; Curry v. Whitmore, 110 Mo. App. 204. (3) The factor's cause of action becomes complete when the owner repudiates the sale. Young v. Ruhwedel, 119 Mo. App. 231. (4) Where the owner refuses to sell, after the broker has produced to him a buyer who is able, ready and willing to buy on the terms proposed, the law regards the sale as made, in so far as to entitle the agent to his commission. Sallee v. McMurry, 113 Mo. App. 253; Perrin v. Kimberlin, 110 Mo. App. 661; Brown v. Smith, 113 Mo. App. 59.

*Silsby & Delaney* for respondent.

NIXON, P. J.—This suit was commenced before a justice of the peace in Greene county and went to the circuit court on appeal after judgment for defendant. The plaintiff, Sam Herrick, is engaged in the business of selling real estate for a commission. He and the defendant, J. A. Woodson, are citizens of the city of Springfield. Plaintiff seeks to recover of defendant a commission for having obtained a purchaser for defendant's property in pursuance of an agreement whereby plaintiff listed defendant's property and undertook to sell the same. After hearing the plaintiff's evidence, the court sustained a demurrer to the same and instructed the jury that plaintiff was not entitled to recover, and a verdict was accordingly returned for the defendant. The case is here on appeal.

Plaintiff testified that defendant saw him in Hunter's grocery store, and, after asking how business was, said, "By the way, while you are showing people around, bring them over and show them my property." Plaintiff's testimony continues: "I said, 'All right, Mr. Woodson, what is the matter with me listing it?' He said, 'All right, sir.' I didn't ask Mr. Hunter for a tablet, as he was a stranger, but I just took out my little bank book and stepped up to the counter and listed it on my bank book here, the price and all, and the next morning I went down and entered it on my real estate book.

The description reads: 'J. A. Woodson, 945 West Walnut street. Six room, modern house; basement; alley to the back; south front; and attic all floored; piped for furnace; good barn; woodshed; lot 55 by 190, $4000, cash.' He gave me those items or I wouldn't have known them. I didn't know anything about his place. Then I advertised the place; put in an ad and kept it there maybe a week or ten days, and then took it out and put in other property. Along about the 8th of May, Dr. Sherman saw me and he was looking to buy a place. I introduced that property to him, and he said he would take his wife out and see it. They went out there and Mrs. Woodson showed them through the house, and he then came back and said that he would have to make a little loan on the place to get it. So I took Mr. Smith of the Farmers and Merchants Bank in my buggy to examine the place. Mrs. Woodson was in the yard and we sat there in the buggy. I asked Mr. Smith if he wanted to go through the house; he said he would loan $1500 on it. Dr. Sherman had $2500 and this would make the $4000 in cash. I went back and told him and he just wrote me out a check for one hundred dollars and drew up a contract and had me sign it to that effect. The next morning between ten and eleven o'clock, I went out to see Mrs. Woodson to see when we could get possession and she said she wasn't going to let the place sell; she flew mad and was going to abuse me, and I told her I didn't come out there for any fuss. I told her to tell Mr. Woodson to call me up, and she said 'it won't do you any good.' So about the noon hour, Mr. Woodson called me over the 'phone and wanted me to come out. I said, 'Mr. Woodson, I would rather you would come to my office; I was out there and Mrs. Woodson was mad, and fussed at me, and I would rather you would come down here.' He said, 'You come out and we will try and fix it up with my wife so that it may be satisfactory.' So that evening I went by and had my son in the buggy. Mr. Woodson came out and I said,

'What are we going to do about this sale?' He said, 'I don't know, Herrick, what we are going to do about it.' I said, 'Well, we had better do something about it.' He said, 'It is too bad it happened, but my wife says she is not going to sell it.' And by this time she came out and grabbed him by the arm and said for him to come to supper. I said, 'I don't care about that; I have sold the place and have earned the commission, and I will just see what the court says about it.' And I left." Plaintiff further testified that he first found that the property was not for sale the day after he had sent Dr. Sherman out to look at it; that he had then entered into a written contract with Dr. Sherman and had received a check for one hundred dollars from Dr. Sherman.

William Schelfritz, a neighbor of defendant, testified: "Q. Now you may state to the jury all you know about this business transaction between Mr. Herrick and Mr. Woodson. A. One morning, I couldn't say the date—I suppose it was the date the proposed sale took place—Mrs. Woodson came down to my place of business, and was very much excited and she called up Mr. Woodson and told him that she didn't approve of the sale of this property, and further said to him, 'Now, Mr. Woodson, I don't want you to talk that way. I want you to come home.' Mr. Woodson later called up Mr. Herrick and said to him, 'Now, Mr. Herrick, I would like for you to come this evening and let us settle this matter in some way,' or 'let us dispose of it in some way.' "

H. D. Hunter, the owner of the grocery store where the property was listed, corroborated Mr. Herrick as to what was said by the defendant in listing his property with the plaintiff.

H. M. Smith, the cashier of the Farmers and Merchants Bank, in regard to the loan, testified substantially the same as the plaintiff, saying that he knew the loan was for Dr. Sherman.

Ira Herrick, son of the plaintiff, who went with his father in the buggy to see the defendant, testified: "My father asked what he was going to do about the sale, and he said, 'Well, Mr. Herrick, I don't know what I shall do about it. It seems like my wife don't want to sell it.' Father said, 'Well, you know you listed it with me, and I advertised to sell it in the papers and sold it,' and he said, 'I know you did, and I am sorry it has all turned out this way, but she don't want to let it go; she don't want to sell it.' Father said, 'Well, Mr. Woodson, you don't have to sell your place, but I went to the trouble to advertise and sell it, and I think I am entitled to my commission.' And by that time, his wife had come out and told him to come to supper and not stand out there and talk to him; that he was no part of a gentleman; and father said, 'Well, I didn't come out here to fuss with you; I came out here to make some kind of an arrangement to let this sale go through satisfactorily.' She said something more and he said, 'Well, I won't fuss with you; I will see what the court says about it in the morning.'"

The testimony of Dr. Sherman is practically the same as that of the plaintiff as to the purchase. He testified that he and his wife went to look at the property. His testimony continues: "We met Mr. Woodson as we went into the place and told him our business, that Mr. Herrick had sent us there to look at the property; he said we would have to excuse him as it was about time for work at the shops; it was between twelve and one o'clock. He said, 'Mrs. Woodson is here and she will show you through the house.' She made some apologies for the house not being in very good condition for inspection that day as they had had a party there the night before. She took us through all the rooms but the basement and out to the barn; we came back through the house again and went out the door at which we had entered, and I made the remark that I believed it was what we wanted. I was well pleased with the

property, and so we went on and talked the matter over at home, and decided that it was what we wanted. So I went to see Mr. Herrick and told him I believed it was about what we wanted, and I told him I would give him a check for one hundred dollars to hold the trade and for him to find out when we could get possession. I was able to pay $4000." He also explained that he had over two thousand dollars in the bank and some seven or eight hundred dollars coming due in outstanding notes and a lot in Elwood valued at about seven hundred dollars, and that he didn't owe anything. That Herrick was to see about getting a loan on the property, and that he would have made a second loan on the property if necessary; that he had no doubt about getting the money. He stated that the check for one hundred dollars was given the same day that he looked at the property and before he knew anything about Mrs. Woodson refusing to sell the property. Under a persistent cross-examination, he stated that he was "almost positive it was that afternoon; not later than three o'clock." That at the time he gave the check, he didn't know exactly how much he would have to borrow, and he didn't remember that he had told Herrick how much he would need. He further stated that Mrs. Woodson had gone down to see Mrs. Sherman and called him up and asked him to call off the sale; that he told her he could not as he had paid Mr. Herrick the one hundred dollars.

Sam Herrick, being recalled, testified that after Dr. Sherman had looked at the place, he agreed to take it if he could make a loan on it. "I asked him how much he would have to have. He said he thought he would have to have fifteen hundred dollars, and he said, 'If I can get fifteen hundred dollars, I will take the place.' I said, 'I will get the money for you.'" He stated that he then arranged for the loan with Mr. Smith and went to Dr. Sherman and said, "Mr. Smith will let you have the money." "Dr. Sherman said, 'You are sure.' I said, 'Yes, sir, I am sure.'" Then Dr. Sherman wrote him

a check for one hundred dollars and wrote the contract and Herrick signed it.

A real estate agent is entitled to his commission when he procures a purchaser able and willing to buy on the terms authorized by the principal, and the purchaser is ready, able and willing to carry out such terms. [Gelatt v. Ridge, 117 Mo. 553, 23 S. W. 882; Childs v. Critchfield, 66 Mo. App. 422; Morgan v. Keller, 194 Mo. 663, 92 S. W. 75.] And where the owner refuses to sell after the broker has produced a buyer who is able, ready and willing to buy upon the terms proposed, the law regards the sale as made, in so far as to entitle the agent to his commission. [Sallee v. Mc-Murry, 113 Mo. App. 253, 88 S. W. 157; Perrin v. Kimberlin, 110 Mo. App. 661, 85 S. W. 630; Brown v. Smith, 113 Mo. App. 59, 87 S. W. 556; Sills v. Burge, 141 Mo. App. 148, 124 S. W. 605.] And the unwillingness of the defendant's wife to sign the deed is no defense. [McCray v. Pfost, 118 Mo. App. 672, 94 S. W. 998; Curry v. Whitmore, 110 Mo. App. 204, 84 S. W. 1131.]

The evidence is abundant to show that plaintiff had fully complied with his contract and was entitled to his commission.

It is true that in this case there is not a large amount at stake; but we know of no rule which classifies legal principles according to the amount involved, applying one set to the big cases and the other set to the small cases. We read the law as written that every litigant, no matter how insignificant the amount of his claim, stands on the common platform of justice when he enters the court, and is the equal of every other litigant in the protection he will receive and the law by which he will be tried; that all are entitled to their day in court under the equal protection of the same law with a remedy afforded for every injury to person, property or character.

In this case, after the most scrutinizing examination of the evidence, we have found no reason why plain-

Bank v. Mills.

tiff should have been compelled to appeal to this court to get his constitutional right of trial by jury. Under the evidence, it was for the jury and not the court to pass on plaintiff's case.

The judgment is reversed and the cause remanded for a new trial. All concur.